**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **JOHANNA JAGUSCH,** | **) CASE NO. 1:08cv1469** |
| **PLAINTIFF,** | **)** |
| **v.** | **) MAGISTRATE JUDGE GREG WHITE** |
| **MICHAEL J. ASTRUE,** | **)** |
| **DEFENDANT.** | **) MEMORANDUM OF OPINION** |

Plaintiff Johanna Jagusch ("Jagusch") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying her claim for Period of Disability ("POD"), Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(I), 423, 1381 *et seq*. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). The case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the Court affirms the final decision of the Commissioner.

## I. Procedural History

On November 17, 2004, Jagusch filed applications for POD, DIB and SSI benefits alleging a disability onset date of September 23, 2004 and claiming that she was disabled due to depression and borderline intellectual functioning. Her application was denied both initially and upon reconsideration. Jagusch timely requested an administrative hearing.

On December 14, 2007, Administrative Law Judge Peter Beekman ("ALJ") held a hearing during which Jagusch, represented by counsel, testified. Bruce Holderead also

testified as the Vocational Expert ("VE"). On December 27, 2007, the ALJ found Jagusch had the residual functional capacity ("RFC") to perform a range of work, including her past relevant work, and that she was not disabled within the meaning of the Act. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

On appeal, Jagusch claims the ALJ erred because he improperly rejected the opinion of the treating physician, and he failed to consider substantial evidence of Jagusch's impairment or combination of impairments in Listing 12.05(C). The latter argument includes an assertion that the ALJ failed to consult an additional medical expert when addressing whether Jagusch has an impairment or combination of impairments that medically equals the listing. (Doc. No. 15.)

## II. Evidence

**Personal and Vocational Information**

Born on January 6, 1982, and age 25 at the time of her administrative hearing, Jagusch is a "younger" person. *See* 20 C.F.R. § 404.1563 and 416.963(c). Jagusch attended special education classes and was involved in the individualized education program ("IEP") at Parma City Schools. (Tr. 153-73.) In 1999, she was exempted from written tests in a number of school subjects including reading and math. (Tr. 153.) She obtained her high school diploma in 2004. (Tr. 340.) She has had work experience as a cashier and cleaner. (Tr. 581, 586.)

**Mental Health Records**

Over a period of four years, Jagusch had three treating physicians, all psychiatrists at The MetroHealth System in Cleveland, Ohio. She first saw Dr. Raul Hizon on December 23, 2003, for moodswings and depression. (Tr. 483.) After the first several visits, Dr. Hizon provisionally diagnosed her with bipolar disorder and assigned her a Global Assessment of Functioning ("GAF") score of 80.[1] (Tr. 480-484.) Jagusch again saw Dr. Hizon on January

[1]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. A

15, 2004 when she reported that she had been euthymic for two weeks. (Tr. 478.) She was next examined on February 3, 2004 when she reported hyperactivity, temper tantrums and conflicts with co-workers. (Tr. 476.) Dr. Hizon assigned her a GAF of 70 at this visit.[2] (Tr. 477.) In April 2004, after Jagusch reported progress and denied significant depressive symptoms, Dr. Hizon determined that her assessment was inconsistent with bipolar disorder or a major depressive disorder. He diagnosed her with generalized anxiety. (Tr. 470.) In May, June and July of that year, Jagusch reported feeling better or feeling fine. (Tr. 445, 447, 454, 456.) In September 2004, Jagusch told Dr. Hizon that she was feeling fine and that her temper problems had improved. (Tr. 434.) In December 2004, Jagusch told Dr. Hizon that she was feeling fine, had just obtained her high school diploma, had a new boyfriend and had plans to attend college.[3] (Tr. 340.) At this visit, she was diagnosed with adjustment disorder. *Id.* In April 2005, she told Dr. Hizon that she was feeling stressed out and had recently resigned from her factory job. (Tr. 276) The diagnosis at this visit was adjustment disorder with anxiety and depression. (Tr. 277.) At her next visit in May 2005, she reported that she was relieved of stress and the diagnosis was "adjustment disorder, in remission." (Tr. 268, 269.)

In August 2005, Jagusch began seeing Dr. Eugenia Abonyi. (Tr. 376.) Dr. Abonyi assessed her to have fair focus and concentration (Tr. 376), as well as good insight, judgment, impulse control and memory. (Tr. 377.) The diagnosis by Dr. Abonyi was "major depression, recurrent moderate" with a GAF score of 85. (Tr. 377.) The following month,

---

GAF score of 71-80 indicates that any symptoms are transient, predictable reactions to psycho social stressors and suggests no more than slight impairment in functioning. *See* American Psychiatric Ass'n., *Diagnostic and Statistical Manual of Mental Disorders* 33-34 (American Psychiatric Association, 4th Ed. Tex rev. 2000) (*DSM-IV-TR*.)

[2]A GAF score of 61-70 indicates some mild symptoms like depressed mood or mild insomnia or some difficulty in social, occupational or school functioning, but generally functioning pretty well, and has some meaningful interpersonal relationships. *See DSM-IV-TR* 34.

[3]Jagusch filed her application for SSI on November 17, 2004.

Jagusch reported that she felt good. (Tr. 372.) In October and November 2005, Dr. Abonyi determined that she was less depressed, with a brighter affect. (Tr. 346, 365.) In February and March 2006, Jagusch was stable and reported efforts to find employment. (Tr. 323-26, 331-32.) In May 2006, Jagusch told Dr. Abonyi that she was working for a temporary service and doing fine. (Tr. 271.) In the August 2006 visit, Jagusch stated that she was doing well but feeling anxious. (Tr. 249.) On September 28, 2006, she reported that she had found a part-time job in a fast food place where she had been working for 3-4 weeks. (Tr. 240.) Dr. Abonyi reported that Jagusch was stable from June through September 2006. (Tr. 240, 249, 251, 257.)

On October 30, 2006, Jagusch began seeing Dr. Rajeet Shrestha. (Tr. 235.) During this visit, she reported having problems at work, feelings of anxiousness, and described having panic attacks where she felt flushed and short of breath. *Id.* Dr. Shrestha diagnosed her with major depression, recurrent moderate. (Tr. 236.) In November and December 2006, Jagusch reported that she was doing better, her medication was working and she was coping better at work. (Tr. 231, 233.) She reported that she had some anxiety at work and had to take a Xanax, but normally only needed to take two to three pills in a month. (Tr. 229.) In February and March 2007, she reported that she was feeling fine and spoke of traveling out-of-state or vacationing on multiple occasions. (Tr. 219, 221.) In April 2007, Jagusch claimed to have had a "nervous breakdown" at work one day when she shouted and swore at her manager. (Tr. 521.) She said that she was unable to adjust to different work schedules or to work for prolonged periods because of anxiety. *Id.* Dr. Shrestha's diagnosis was anxiety and depression, and he increased her medication. (Tr. 521-22.) In May 2007, Jagusch said she was "doing pretty good" and that work was "ok." (Tr. 539.) Dr. Shrestha's assessment was that she had improved and the diagnosis was "anxiety." At her appointment on June 26, 2007, Jagusch said she was "not doing so well" as she had lost her job the previous week when she walked out upon learning she did not receive a bonus. (Tr. 542.) Dr. Shrestha's assessment was that she was stable, but stressed. (Tr. 543.) In November 2007, she complained of "low motivation at times" and "anticipatory anxiety," but reported that she felt

fine. (Tr. 555.) She had obtained custody of her step-sister and was looking for work. *Id*. She reported that she was rarely (only about once a month) taking her anxiety medication. *Id.*

On December 13, 2007, Dr. Shrestha completed a Medical Assessment of Ability To Do Work Related Activities - Mental. (Tr. 566-67.) He opined that she had depression and anxiety which interfered with: a) her ability to maintain attention, b) her ability to cope with the stresses of a full-time job, and c) her thought organization. (Tr. 567.) Dr. Shrestha believed Jagusch could not maintain a full-time job. *Id*. Out of fifteen work-related mental activities, he found that she had good ability in eight, fair ability in seven and poor/no ability in one.[4] (Tr. 566-67.)

**Examining Physicians**

Dr. Richard Davis, Clinical Psychologist, examined Jagusch on December 22, 2004, at the request of the agency. (Tr. 181-186.) She did not indicate difficulties getting along with co-workers or supervisors when she was employed; she stated that she could understand and follow directions; and, she indicated that she had some difficulties performing repetitive tasks if math was involved. (Tr. 181, 186.) He noted that she described herself as happy. (Tr. 182.) Dr. Davis administered the Wechsler Adult Intelligence Scale III and received a verbal IQ score of 71, performance IQ score of 76, and a full scale score of 71. (Tr. 184.) He diagnosed her with borderline intellectual functioning and a math disorder. He assigned her a GAF score of 70 – indicative of mild symptoms. (Tr. 186.) He also said she did not appear to have any difficulties dealing with stresses and pressures while in his office. *Id.*

Dr. Alice Chambly, Psy.D., a state reviewing physician, assessed Jagusch's work-related mental functioning in March 2005. (Tr. 188-205.) After reviewing the evidence in

[4]The activities rated "good" were: ability to follow work rules, use judgment, interact with supervisors, and function independently. The "fair" activities were: relating to co-workers, dealing with the public, dealing with work stress, maintaining attention and concentration, understanding, remembering and carrying out detailed instructions, behaving in an emotionally stable manner. The "poor/no[ ]" ability was: understand, remember and carry out complex job instructions. (Tr. 566-67.) "Fair" was defined on the form as the ability to function is "seriously limited but not precluded." *Id.*

the file, the assessment was affirmed by John S. Waddell, Ph.D. (Tr. 192.) While Dr. Chambly noted that Jagusch had borderline intellectual functioning, she also remarked upon Jagusch's ability to carry on activities of daily living, her adequate attention, concentration and memory, and her lack of difficulty in interacting with and maintaining relationships with others. (Tr. 192.) The assessment acknowledged her history of depression, but indicated that she denied current symptoms. *Id.* The symptoms appeared to be controlled with medication. *Id*. Dr. Chambly reviewed the case under Listings 12.04 and 12.05. (Tr. 193-205.) Under the "B" criteria,[5] she opined Jagusch had mild restrictions of activities of daily living and social functioning and moderate difficulties in maintaining concentration, persistence and pace. (Tr. 204). Dr. Chambly concluded that Jagusch could "complete a wide range of tasks consistent with her reduced intellect." (Tr. 192.)

**Hearing Testimony**

Jagusch testified that she has a learning disability and cannot comprehend some things like English, spelling or math. (Tr. 582.) She is not good with money, but can use a cash register. (Tr. 586.) She does not read the newspaper because she has a hard time understanding certain things, but she listens to the radio and watches television. (Tr. 587.)

Jagusch also testified that she suffers from anxiety attacks. (Tr. 582.) She stated that her past anxiety attacks sometimes required her to go home from work. (Tr. 588.) She said that they were triggered by other people not doing their jobs, other people coming to her, and other people standing around. (Tr. 589.) She testified that she gets aggravated when she feels that other people do not do their part or ask her to do their job for them. (Tr. 586.) She claimed that she suffers from anxiety attacks two to three times a week even when not working. (Tr. 590.) She further testified that her anxiety attacks give her chest pains, and make her hot, shaky and sweaty. They last roughly fifteen to twenty minutes. (Tr. 590.) She said she takes medication as needed for her anxiety. (Tr. 591.) Jagusch also testified that she suffers from depression, which makes her cry for no reason, makes her mad and upset, and

---

[5] In the instant case, the "B"criteria refers to Listing 12.05(D). See page 12, *infra*.

sometimes interferes with her sleep. (Tr. 591-92.)

When the ALJ asked her to describe an average day around the house, she claimed that it is very hard for her. (Tr. 583.) She said that she cannot concentrate on one task at a time. *Id*. She has a hard time following written recipes and measuring ingredients. (Tr. 585.) She does not stay in contact with friends because she is concerned they will make fun of her disability and her speech impediment. *Id*. At the hearing, she testified that she had a fiancé but experienced more trouble than normal with the relationship. (Tr. 592.) She sometimes cooks breakfast for the family, cleans the house, and does the laundry. (Tr. 583.) She also sometimes plays with the dog and takes him out. *Id*. She watches television and sometimes plays video games for two or three hours at a time. *Id*.

Bruce Holderead, the vocational expert, testified that Jagusch's past work as a cashier, cleaner, and fast food worker was unskilled work. (Tr. 595.) The VE testified that a hypothetical person with no physical limitations but who: a) could remember and carry out simple job instructions, and could carry out some detailed job instructions, but could not understand, remember and carry out complex job instructions; b) could follow work rules and deal with the public; c) should not be involved in any close, sustained interpersonal relationships, but could have superficial and very strictly defined, short and distinct relationships; and, d) had a moderate degree of difficulty, defined as being within average or reasonable limits, in maintaining attention, concentration, persistence or pace, could perform Jagusch's three prior jobs. (Tr. 596-97.) The VE also testified that there would be no jobs for that same hypothetical person with the additional limitations of being unable to relate or react predictably in social or occupational settings and having a moderate degree of difficulty dealing with work stresses. (Tr. 597-98.)

**III. Standard for Disability**

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[6]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Jagusch was insured on her alleged disability onset date, September 23, 2004, and remained insured through the date of the ALJ's decision. (Tr. 18.) Therefore, in order to be entitled to POD and DIB, Jagusch must establish a continuous twelve-month period of disability commencing between September 23, 2004, and December 31, 2008. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

**IV. Summary of Commissioner's Decision**

After consideration of the entire record, the ALJ made the following findings

---

[6]The entire five-step process entails the following: First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and416.900(d) (2000). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

regarding Jagusch:

1. She has not engaged in substantial gainful activity since the alleged onset of her disability.
2. Her borderline intellectual functioning is a severe impairment but her alleged depression is a non-severe impairment that places no more than a minimal limitation on her ability to perform basic work-related activities.
3. She does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [Listing 12.05]
4. She has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple tasks and cannot perform complex work, and she is limited to work involving only minimal interaction with co-workers.
5. She is capable of performing past relevant work as a cleaner and as a cashier as this work does not require the performance of work-related activities precluded by her residual functional capacity.
6. She was not disabled within the meaning of the Act at any time between the alleged onset date, September 23, 2004, and the date of the ALJ's decision.

(Tr. 18-25.)

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere

scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Commissioner of Social Security*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints. *See, e.g., Gaffney v. Bowen*, 825 F.2d 98, 101 (6th Cir. 1987) (*citing Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981)).

## VI. Analysis

### A. Treating Physician

Jagusch claims that the ALJ erred by improperly giving little weight to Dr. Shrestha's "checklist" opinion and rejecting his conclusion that she is unable to maintain a full-time job.

It is firmly established that the medical opinion of a treating physician must be accorded greater weight than those of physicians employed by the government to defend against a disability claim. *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988) (*citing Kirk*, 667 F.2d at 536); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Whitson v. Finch*, 437 F.2d 728, 732 (6th Cir. 1971). When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination, the

nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to decision. *Id.* Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled. 20 C.F.R. § 404.1527(e)(1).

Here, Dr. Shrestha began treating Jagusch in October 2006. In December 2007, (shortly before the administrative hearing), he completed the checklist and issued an opinion stating that Jagusch is unable to maintain a full-time job due to her limited coping skills. (Tr. 567.) The ALJ explained that up until that time, Dr. Shrestha's treatment records did not support his comments or his checklist markings. (Tr. 24.) Such lack of internal corroboration and consistency is a valid reason to discount a medical opinion. *See* 20 C.F.R. § 404.1527(d)(3)-(4). The ALJ pointed out that Dr. Shrestha's treatment records set forth that Jagusch experienced nearly continuous improvement from October 2006 through December 2007. (Tr. 24.) The doctor's records referenced Jagusch's custody over her step-sister, her reports of improvement or of being fine, her travels, her efforts to find work, and her very limited use of anxiety medication. (Tr. 219, 221, 229, 231, 233, 539, 555.) This evidence from Dr. Shrestha's treatment notes corresponds with the ALJ's residual functioning capacity determination. Furthermore, the ALJ noted that Dr. Shrestha never imposed restrictions consistent with his opinion of her limited ability to work – even when informed that she was looking for a job or during the times when she was employed. (Tr. 24.)

The ALJ adopted the portions of Dr. Shrestha's opinion that were consistent with the other evidence.[7] (Tr. 24-25.) The ALJ's decision set forth how the opinions of the other

---

[7]The hypothetical question framed for the vocational expert included the assumption that Jagusch could not understand, remember, and carry out complex job instructions, the one area that Dr. Shrestha rated her as having poor or no abilities. (Tr. 566-567.) The ALJ also adopted certain portions of Dr. Shrestha's reports into the findings of fact: Jagusch is limited

treating and examining psychologists and psychiatrists were contrary to the extreme portions of Dr. Shrestha's opinion. *See* 20 C.F.R. § 404.1527(d)(4). Specifically, the ALJ noted that Dr. Hizon and Dr. Abonyi, both of whom had treated Jagusch for long periods, assigned her GAF scores reflecting only a slight impairment or, at most, mild symptoms. (Tr. 22.) Also, the ALJ relied on Jagusch's own reports of her daily functioning and work history. (Tr. 22-24.) *See* 20 C.F.R. §404.1527(d)(4). All of this evidence justified the ALJ in giving only little weight to Dr. Shrestha's medical opinion and no weight to his vocational opinion, that Jagusch is unable to maintain a full-time job. (Tr. 25.)

Jagusch contends that the ALJ should have accepted Dr. Shrestha's vocational opinion that she is unable to maintain a full-time job. The Commissioner argued that the ALJ correctly determined that Dr. Shrestha's conclusion went beyond the bounds of a medical opinion.

The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject determinations of such a physician when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984). According to 20 C.F.R. § 404.1527(e)(1), the Social Security Commissioner makes the determination whether one meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled." *Id*. The Commissioner must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982). Therefore, the Court concludes that the record contains substantial evidence to support the ALJ's decision to

---

to simple tasks and cannot perform complex work, and she is limited to work involving only minimal interactions with coworkers. (Tr. 20, 24.)

give no weight to Dr. Shrestha's opinion that Jagusch is unable to maintain a full-time job.

**B. Listing 12.05**

Jagusch also argues that substantial evidence proves that she met or equaled the requirements necessary to establish mental retardation under 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.05. She contends that the combination of her mental impairments at least equal Listing 12.05(C). Furthermore, she avers that the ALJ erred by not eliciting expert medical testimony at the hearing or thereafter to address whether she indeed equals the criteria set forth in Listing 12.05(C). The Commissioner responds that the ALJ's finding was supported by substantial evidence.

Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P, App. 1, states, in pertinent part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; **OR**
>
> B. A valid verbal, performance, or full scale IQ of 59 or less; **OR**
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function; **OR**
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

A claimant must demonstrate that her impairment satisfies the diagnostic description for the listed impairment in order to be found disabled. *Id*. at § 12.00(A). A claimant will meet the listing for mental retardation only if the impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria. *Id.*

Here, the parties have not disputed 12.05(A) or (B). Jagusch argues that because her IQ score was only one point above the range in 12.05(C), the ALJ should have considered her other medical impairments that impose significant work-related functional limitations. She points to Dr. Chambly's and Dr. Waddell's opinion that Jagusch had moderate difficulties in maintaining concentration, persistence and pace, (Tr. 204) and moderate limitations in her ability to understand, carryout and remember detailed instructions. (Tr. 190.) Jagusch argues that this evidence, along with Dr. Shrestha's opinion that her depression and anxiety interfere with her ability to maintain a full-time job, was substantial evidence to find she was impaired.

The ALJ concluded that Jagusch does not meet the requirements of C and D because her IQ score was 71. (Tr. 19.) The ALJ found that the requirements of C were not met because Jagusch did not have an IQ of 60-70 *and* "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id*. He concluded that Jagusch's depression was "a non-severe impairment that place[d] no more than a minimal limitation on her ability to perform basic work-related activities." *Id*. Next, the ALJ analyzed the requirements of D: the claimant must have an IQ score of 60 through 70 and two of the following: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (Tr. 19-20.) The ALJ concluded that Jagusch met only one of these requirements: she had moderate difficulties in concentration, persistence or pace due to her borderline intellectual functioning which interfered with her ability to attend to tasks. (Tr. 20.) However, as she meets none of the other requirements, Paragraph D is not satisfied. *Id*.

Jagusch's lowest IQ score was 71. Therefore, it is clear that she failed to directly meet the criteria set forth in § 12.05(C). *See Anderson v. Sullivan*, 925 F.2d 220 (7th Cir. 1991) (concluding that claimant's IQ score of 71 was insufficient to qualify under § 12.05(C), then

requiring 60-69 to qualify);[8] *Cockerham v. Sullivan*, 895 F.2d 492 (8th Cir. 1990) (holding that claimant's IQ score of 71 did not meet the requirements in § 12.05(C), then 60-69 as well); *Ellison v. Sullivan*, 929 F.2d 534 (10th Cir. 1990) (finding that claimant's verbal IQ of 72 did not satisfy the two-part test of § 12.05(C), then 60-69 as well); *Riley v. Apfel*, 1998 WL 553151 at *4, Case No. 97-1799 (6th Cir. Aug. 20, 1998) (finding that claimant's IQ score of 77 did not meet criteria of § 12.05(C)).

Jagusch contends that the ALJ should have considered whether she has other medical impairments that "equal" the Listing in § 12.05(C). Specifically, Jagusch maintains that Dr. Chambly's opinion that she had moderate difficulties in maintaining concentration, persistence and pace (Tr. 204) and moderate limitations in the ability to understand, carryout and remember detailed instructions (Tr. 190), coupled with her low IQ should qualify as the equals to or meeting Listing 12.05(C).

Pursuant to 20 C.F.R. § 416.926, an impairment is "medically equivalent to a listed impairment in appendix 1 of subpart P of part 404 [§ 12.05] if it is at least equal in severity and duration to the criteria of any listed impairment." In determining whether a claimant equals a listed impairment, the Commissioner must consider all of the claimant's impairments in combination. *Lankford v. Sullivan*, 942 F.2d 301, 306 (1991). "For a claimant to qualify for benefits by showing that [her] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [she] must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). An impairment is non-severe if "it does not significantly limit [one's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a).

Jagusch has the burden of producing evidence of medical equivalence. 20 C.F.R. §§ 404.1508, 404.1514. She has not established that there were any medical findings suggesting that she is limited to a degree equal to Listing 12.05(C). She was not diagnosed with mental

[8]On December 12, 1990, the listing was amended so that it now applies to claimants with a full, verbal, or performance scale IQ of 60-70, inclusive. 55 Fed. Reg. 51,208.

retardation and neither her treating nor the examining doctors opined that her combination of impairments equaled Listing 12.05(C). In fact, the ALJ noted that Jagusch's GAF scores have consistently reflected only a slight impairment or, at most, mild symptoms. (Tr.22.) Moreover, Jagusch testified to a variety of activities, including taking care of herself and a pet, and adopting her step-sister. (Tr. 23.) These activities are inconsistent with a significant work-related limitation of function. (Tr. 22-24.) The ALJ also noted that Jagusch has worked since her onset date, as recently as June 2007. (Tr. 23.) This evidence supports the ALJ's finding that Jagusch does not have an impairment or combination of impairments that medically equals one of the listed impairments in § 12.05. (Tr. 19-20.)

As to Jagusch's argument that the ALJ should have elicited additional expert medical advice as to the Listing Requirements, the opinions of the state agency doctors, Davis and Chambly, were sufficient, when considered with the entire record, for the ALJ to make a determination of equivalency. S.S.R. 96-6p (1996); 20 C.F.R. § 404.1527(c)(3)(ALJ is only to obtain additional evidence if he cannot, on the record before him, make a determination about the claimant's disability); *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2002)("an ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary.")

After careful consideration of the record, the Court concludes that the ALJ did not err by finding that Jagusch failed to meet or equal Listing 12.05. Based upon the record, no further medical expert testimony was necessary.

**VII. Decision**

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is affirmed and judgment is entered in favor of the Defendant.

IT IS SO ORDERED.

s/ Greg White
United States Magistrate Judge

Date: February 13, 2009